090829 in re Marriage of Michael Anderson Appellee by John Teichel v. Molly Murphy, formerly known as Molly Anderson, Appellant Jeffrey Reilly. You may proceed, Counsel. I'd like to do today is quickly tell you why we're here, how we end up getting here and what we want the court to do for us and why. The way we calculate what has happened by virtue of Judge Ault's orders is there's actually been a 71% reduction in what Molly is receiving from what she had then from Mike. Even when over the next four years, it's actually three now until the twin daughters reach college age, that's $140,000 issue or set of issues. What we had here, the parties were divorced. They reserved issues of child support and maintenance. Judge Galley heard the case first. He found Molly completely and fully disabled, no duty to rehabilitate. He posed a 90-day full reporting requirement on Mike because he had not produced documents. Found him in contempt, found that he was underemployed, ordered him to engage in a job search. Entered a floor order of $900 per month in maintenance, $206 per week in child support. The case ended up getting heard by Judge Ault on this review and also various motions for rules of show cause. Judge Ault held like and contempt again numerous times. There was evidence that he had not disclosed proceeds from a stock sale, a house, a brokerage account. And basically what, in our view, should have been an increase in maintenance and a substantial increase in support turned around to a termination of Molly's maintenance, a substantial elimination of the reporting requirements, a child support order that only increased support commensurate with the employment increase from new employment, an alteration in medical and an award of fees that was basically less than even the amount that had been generated on the rules of show cause that Mr. Anderson was found in contempt. You know, in this case, the one party is a minority shareholder, though. I mean, it's not like they were in control of what was going on, right? Right. Well, he's a 2% minority shareholder, but it is a family corporation. I know, but the other family members aren't married, weren't part of the marriage, were they? Oh, no. I mean, he had to be married to more than one person, I suppose. I know where you're going, Judge. I'm assuming you're looking at the question of whether we can say that the transaction was bogus or a ploy. Now, we are making that argument. We set it out in our brief. There were other minority shareholders that did not agree to get cashed out. There were other family members. At least that's what the record shows. Let me follow up on that, if I can. The agreement to buy out minority shareholders seems to be required by the company. It doesn't seem to give them options. But in your reply brief, you hint at least that the other family members rejected it and that this fellow took it. But it doesn't seem to be an option in the agreement. So can you straighten that out for me? I would agree it doesn't seem to be an option. Our point was that somewhere along the line, other people that had the same documents to look at, at least what the record shows, did not seem to take it. Now, eventually I want to get away because our main argument doesn't focus on the reason for why all this happened but the effect of it. But as far as we're concerned, there is enough evidence in the record to at least rouse some suspicion here that, our experts said the value should have been at least twice what the option price was. This is his parents that are actually doing this transaction. And he didn't disclose the proceeds when he first received them on his affidavit through the corporate. The whole thing kind of smells bad. But that's not what our main argument is. Can I launch right into what I think our point is on that? And I'll get back to it with time and give you more of the history here. What we're saying in its simplest form is this. The man had this 2% stock holding in his parents' corporation. It was producing substantial income through dividends and pass-through income. And an average from 05 through 07, this Molly's support at 28% for the two kids was $22,000 a year. So we're talking about a substantial amount. Actually, a large percentage of what Mike was actually making for that period, we calculated to about 70%, was this income just flowing to him without him doing anything other than being the son of the owners by comparison to his employment income. Where we think Judge Ault was just simply wrong is that money that came to Mr. Anderson, the $192,000, we considered that to have been income. Now, Judge Ault said it was property. And my second argument is even if it was considered property, it still needs to be considered in the overall analysis here. If you look at what Judge Ault's order said, he makes it about as clear as possible on the question of additional maintenance, meaning the maintenance that Molly wanted to have continued and Mike wanted to have terminated, and this issue of child support, that he was just simply not going to consider those proceeds at all. What we say is if you look at Roger's case from the Supreme Court, they talk about the test being a facility and the facilitation of the ability to pay support. What we had here was Mr. Anderson starts with this illiquid asset. I mean, he's a 2% shareholder. I would agree. He can't make his parents sell, buy him out. They can't do anything. That's the great rights of any minority shareholder. At that point, he really can't do anything with that interest. He can't use it to buy his kids clothes or buy a car for himself or anything else. That's an asset that's just in existence that's illiquid. He can't do anything with it. But he does end up cashing out. He gets $192,000. We think he's now coming to $192,000 of spendable income. And if you look at the cases that have come after Roger's, the Lindemann case talks about distributions from IRAs. This Colangelo case talks about stock options, vesting. All of the cases since Roger's and the substantial trend here is that even if something looks and talks and walks like a property interest, that that still is considered income. That's what the Colangelo court said. It's the fruits of marital property, even marital property itself, that can be income. Does that make a difference that it's marital property and not separate? Well, it could be marital property. I think the cases haven't drawn that distinction. I think the point is if someone – all the cases that I've found where someone argues that they have received property in the divorce, whether it's marital or their own non-marital, and have argued that means that when I transfer it or I cash it in, that that can't be an income point. It's just an asset. It's property to property to property. That's what Judge Ault seemed to follow the mantra of Mr. Anderson on that issue. Why did he transfer? He had stock and then he has gold. Well, he had stock, then he had proceeds, then he has gold, which, of course, is non-traceable, non-income producing. And he went from providing $22,000 of income just from this AEC stock in child support alone, and now all of a sudden we are in a situation where through his own devices he has something that you can't get any child support out of because the gold – I mean, he can't pay 28 percent of – Although that's an otherwise investment. Well, I don't like the issue of whether it was wise or not was even considered by Judge Ault. He never got to the question of whether it was wise or there was a good faith motive for putting the stock proceeds into gold eventually. That's nowhere in the order. If you look at it personally, he never gets to that. He never gets to that because he stops at it's not income. That's property proceeds property. I do want to mention something, and I'm, I guess, embarrassed to say, but under the better late than never doctrine, last night I filed another case, this Baumgartner case out of the 1st District. I filed a motion this morning to cite additional authority. I gave a copy to counsel. I don't want to step on his toes and especially not your toes by talking about it if you don't want me to, but I will if you do. But I just want to make sure you are aware of it. And if you want us to file memos or something about that case after the fact, I'm sure I'd be happy to do so. It has to do with the – I think that would be inappropriate. Yeah. We can't perhaps argue it now unless Mr. Hypo is comfortable arguing it as well. But if you want to file something within seven days and then Mr. Hypo can respond seven days after that, is that – That'd be fine. Yeah, that's 7-7. Yeah. Is that enough? Oh, that's fine. Is that enough time, counsel? Mr. Hypo? Yes, that would be fine. Thank you. Yes, my point is when you focus on how the law has been developing, this is income out. Judge Ault said he was not going to – I have trouble understanding that, how you have a reverse stock split where he's a 2% owner and he can't control the corporation. The corporation, you know, gets rid of a stock interest and he gets something and he puts it – and he takes that proceeds and gets another property interest. Well, I haven't found anything in any of these new cases that draws a distinction between whether it's the person pulling money out of an asset because he wants to versus that he has to. And I don't think – the concept of child support should not, in our view, depend on whether it's a have to or a want to. That would go to the good faith of the transaction, it would seem to me, and not to the question of whether or not it's income. Right. I think those are two totally separate issues at this point. Quickly, as I want to make sure that I hit another point on the maintenance, and that is this property interest, okay, it's property – let's assume Judge Ault is right and let's say you would, for some reason, deviate from what we think is the clear trend that you hold these asset distributions as income. Let's say you say it's property. Our point is Judge Ault acted like if it was just gone. It went from property, it went from proceeds to cash to gold to basically nothing. He does not even consider that in the maintenance determination. He says right in his order, on additional maintenance child support, he's not going to consider that these amounts were generated. And it really doesn't matter, in our view, whether it ended up in gold or it ended up staying in the bank or it ended up being put in a fast car. It really doesn't matter to us. Our point is that you still have a property interest, and under the statutes on maintenance and maintenance review, you have to consider the existing property interest. And my maybe weird example, that is, of course, if somebody had $50 million in a non-producing asset for some reason because of economic situations, you certainly wouldn't have a case where, well, because it wasn't generating income, you can't have child support or maintenance based on it. Property is and has to be considered in the equation. We think that Judge Ault just simply got caught up on this issue of whether it was income and never discussed it and never gave it consideration. And we think that these are legal errors that involve interpretation of these statutes. On maintenance also, I wanted to mention a couple of points. If you read Judge Ault's order, he seems to get down to really two things when he gets down to brass tacks. One, he says, I'm going to terminate the maintenance because now this income from the ADC stock is gone. Again, our first point is he's forgetting that there's still these proceeds that are available for use to help provide maintenance. Second, Judge Ault seems to say that Molly was getting money from Social Security for the girls and was not showing on her affidavit that she was behind the eight ball. In other words, he used the words she was banking the girls' Social Security. First of all, his ruling is erroneous because this is the girls' money. This isn't Molly's money. Second, they were getting this money when they were still married before the divorce. So this was not a change in circumstances that Molly was now receiving this money because she was getting it all along. We have to make sure we split apart and to some extent the issue of child support and maintenance. Judge Ault seemed to suggest that this money was being banked. But he was referring and had to be referring about, even if that was true, that she was banking some money, but she was getting $22,000 a year average on these ADC dividends and pass-through income. If you say his child support order is okay, now that money is gone. Now that money is out of the equation, but he still basically said that she was banking the money, but she couldn't possibly bank the money going forward if it wasn't there because of the $22,000 a year average that was basically no longer going to be paid to her. Quickly, what we think you should do, and there's been no argument, and Judge Ault said, I'm not going to deviate from the support guidelines. Our initial and main position is Molly is entitled to $192,000 as income. She should get 28% of it. There was a capital loss, so there's no tax off of it. She should get 28%. If you don't like that, our second argument is it's at least income. If Judge Ault made a mistake on whether it was income, it seems to me it permeates through support and maintenance and the attorney's fees issue and the medical percentage. Then we think there has to be a remand back to the court. Judge, trial judge, you figure out what do you do. Do you give 28%? Do you give something less? Do you deviate below? Do you deviate upward on his employment income because he has $192,000 worth of proceeds? All these issues are ones that if it goes back, I think are fair game and that's what should be ordered. The legal issue, the mistake was that he didn't include it as income or on maintenance, didn't consider it as property. So at a minute, we need to go back. Thank you. Thank you. Thank you. Hey, police court. I'm Jonathan Heifel representing the appellee, Michael Anderson. Mary Beth Durer was the attorney who represented Mr. Anderson during the post-dissolution proceedings. She's a sole practitioner, so I wasn't involved in those proceedings, but she's extremely busy as a sole practitioner, so she asked me to assist Mr. Anderson with the appeal, so that's how I became involved in the case. As Mr. Riva noted, the main issue that's been raised has to do with whether the reverse stock sale, or rather purchase, whether those proceeds constitute income or property, and then whether there was, following that, a separate issue, whether there would be substantial change in circumstances that warranted the trial judge modifying support, maintenance, and the medical expense ratio. And then there's also an issue of attorney fees separate from that. Those are the main issues. As a preliminary matter, I suppose the first matter would be what the standard of review would be in this case. Here, Judge Ault did not interpret the statute or make a decision as a matter of law. Basically, everything that he decided were factual disputes. The record in this case is quite extensive. There are about 1,700 pages of pleadings. And then on the post-dissolution proceedings alone, which took place last spring, there were about five days of testimony in Taffer County that comprised over 600 pages of transcript. And there are about- That's what Ms. Dura left to you. Yes. A thousand pages of exhibits, of both sides' exhibits, just from those proceedings, from the post-dissolution proceedings. And a lot of issues were, pretty much everything was disputed. A lot of issues raised, but just a few are here today. Let me take you away. Is he current on his child support now? I don't know. Does that have to do with the tax issue or the income tax? Yes. I don't know for certain at this point, because I don't know what has transpired since the case was appealed, but I believe at the time of the petition or the motion for reconsideration, which was last fall, that everything was current. In other words, he had paid everything that had been ordered by Judge Ault last spring, the end of last May, and then by the time it got to the motion to reconsider in September, I think, through the summer, he was still current up to that point. Are the twins still underage? Yes. They currently would be, I believe, age 15 right now, and both reside with the mother. Here, because there really was no question of law or interpretation by the trial judge, most of the issues concern the abuse of discretion standard and whether Judge Ault's decisions were reasonable. In other words, whether there could only be abuse of discretion if no reasonable person could have found, as he did. Under the Rogers case, which is the starting point of the Supreme Court case, there the judge had held an interpretive statute to hold that gifts constitute income under the statute. There were no disputed facts there, and so that was a de novo standard of review because the court was determining what constituted income under that case. And here Judge Ault found that case not to be applicable because there were no gifts or factual situations similar to that. But basically what Rogers held for his test was whether there was something that had enhanced the parent's wealth, whereas where there, I think the person, the one parent, was earning $15,000 a year and had $45,000 a year in gifts each year. And so that was clearly income that enhanced his wealth. There have been some subsequent cases. The Lindman case from the second district and the O'Daniel case from the fourth district both look at IRAs, individual retirement accounts, which are really deferred income. And I don't think they're necessarily in conflict, but they both analyze IRAs in a different way because IRAs are money that is put aside now and not taxed, and to which a person doesn't have access and then it's later distributed and taxed at some point in the future. And it's allowed to accumulate and to accumulate gains and income during that period and to grow larger. So I can see how that would be a form of deferred compensation like a pension or like the Colangelo case that dealt with stock options. That also would be an employment bonus that's paid in the future. And so that clearly would be income. And I think the fourth district case, which came later, O'Daniel, which indicated that a portion of an IRA could be income and a portion would simply be a return of principal, but there was no evidence on what portions were which. And the second district case seemed to indicate that also that there could be a double counting that would depend on the proof as to what was actually contributed by the person as opposed to funds that were put in by an employer and allowed to accumulate and then paid out later, which would all be gain if that were the case. Here, it really doesn't – this reverse stock split doesn't fall under any type of deferred compensation because it was an asset that was involuntarily sold and a capital loss was taken on it. So the proceeds that were realized were less than what the basis was in it. And this was a – which I think is important. It was a non-marital asset, so it belonged to Michael Anderson before the marriage, this 2 percent interest in the corporation. We don't know what point he acquired the capital. Let me answer the question I asked Mr. Riva about this exchange. He seemed to think and indicated in his reply brief that it was a voluntary act, that they were offered to these five or six shareholders under 5 percent owners and they could accept it or reject it in any way. No, Your Honor. I don't think the record – I think to the contrary what the record shows, and I don't believe there's evidence in dispute on this point, but it's all contained in basically one exhibit, Plaintiffs' Exhibit 14 and 14A, and I think there's a Defendant's Exhibit 5. That has to do with the capital loss. But the actual transaction or documents pertaining to the reverse split, there was a majority vote. They had a special meeting in December of 2008, and either by proxy or by people who were there in person, and by a majority vote they adopted this reverse stock split and affected all the shareholders. What happened was the shareholders who owned less than 5 percent were bought out completely, and the remaining shareholders who had more than that received a smaller number of shares than what they had before. So everyone's shares were reduced. It's just that the ones who had owned less than 5 percent were wiped out entirely,  So I think there was no option out of this. No, because it was a majority vote, and then all the shareholders were then bound by the split. And I think the reason it stayed in there was to allow for a state planning of the principal owners, which would make sense because then as a result of this reverse split, the principal owners would become the sole owners of the corporation, and they would no longer be the minority owners so that they could proceed with their plans. Mr. Heckel, isn't that all fairly extraneous? Isn't the critical factor that Mr. Anderson acquired money that he could spend for the support of his children? No, I don't think so, because of the fact that he sustained a loss on the transaction. If he had sold it at a gain, I think the gain would clearly be income. I guess the analogy would be maybe someone who had some property that was taken in condemnation, maybe a real property, and so they lose the income stream, and the market value of condemnation is less than what their basis was in it, so they sustain a loss. So he has another form of property than what he had before. He could have always probably sold this stock. There was nothing that required him to do it before, but if he had found another shareholder who would have been willing to buy it or could have taken court action to require it to be purchased, that could have happened. But I don't think the law requires a person to sell an asset and then to reinvest it in something else to generate a higher return. These proceeds were proceeds that belonged to him as an asset before, so there really is no income from it that would be eligible support. In other words, if that were the case, then any proceeds that would be received by anyone from any type of transaction, regardless of the extent of the loss, would be subject to being classified as income, so then everything would be income. There would no longer be a distinction between an asset and an income. So I think in this case, it wouldn't be something that would be available for support because it wasn't something that enhanced his wealth. It gave him something additional. He already had the stock, which could have been sold, but for whatever reason, he hadn't sold it. I understand this correctly. It was non-marital property, the 2% ownership. Yes, it existed. He had, as his own property, sometime prior to the marriage. He had a non-marital asset of 2% of the stock interest, and the nature of the asset changed. It was the reverse stock split. It was bought out, and then he received an amount of money, proceeds, which he converted to another asset. Yes, he received $192,700 a check. Which remained non-marital. Yes, it would still be a non-marital asset from what it was before, the same classification, which I think is important. But we're not talking about allocation of marital assets here. What we're talking about is child support. Yes. And the question is whether Mr. Anderson has money to contribute to the support of his children. Well, clearly, if it's viewed as whether he has money in terms of cash, at that point, yes, he would have had when he received the proceeds. He would have had money so that if that were the case, though, there's no court that's held that yet, but if that were the case, then there would no longer be any distinction between property and income and any proceeds received that would be in the form of cash or something that could be liquidated into cash could be eligible for support. Okay. I guess I'm not understanding why there's a significance of whether it's a marital or a non-marital asset. Well, if it had been a marital asset, then the other spouse would have had at some point an interest in it, whereas here, because it was non-marital, the other spouse never had acquired any interest in the asset. So that could make a difference if it were marital and if there were somehow, based on whether it had been allocated previously or not, if there were something that the other spouse still had an interest in, then the other spouse might have an interest in the proceeds. But marital versus non-marital doesn't determine what's available for distribution for child support, does it? No, no. It would be whether the parent who receives something that enhances that person's wealth, I suppose it would be the test for income under Rogers as to whether that's income that would be available for support. Okay. Yes. That's the last two minutes. Then the other issue, which I don't think there's any, it was alluded to in the Appellate's reply brief, but I have not found any evidence that there was any improper motive for this reverse stock split. In other words, the basis for it, or the reason for it, was to avoid a support obligation by somehow eliminating the income stream. Because this had been an S corporation, so it didn't file a separate income tax return, so all the income and loss of the corporation is passed through on these K-1 statements to the various shareholders, and then they report it on their own income tax returns. Can I back up on that with regard to the procedural history? In this case, there was a judgment of dissolution of marriage entered in August of 2004, correct? 2004. Okay. And then there was a supplemental judgment in September of 2004. Yes. Okay. But issues regarding child support and maintenance were reserved. That's right. And what was the order that divided the marital and non-marital property? At the time, I think there was a settlement agreement, or a marital settlement agreement that was part of that supplemental judgment, which I believe was in September of 2004. Right. And under that, it classified the various items as either marital or non-marital. This was classified, this AEC stock was classified as non-marital in that agreement, but the marital assets, I believe, were divided 60-40. In other words, 60 percent to the wife and 40 percent to Michael. My point is, as I understand it, there were these judgments entered, and there was a classification in the divorce between the property interests, marital and non-marital. So there were awards to the respective spouses with regard to the marital property, correct? Yes. Right. Okay. What was reserved was maintenance and child support. That's right. And it's a subsequent decision regarding maintenance and child support, which you'll hear in front of us today about some of these ongoing disputes with regard to that. That was done after there was the earlier decision. I think in December of 2006 is when the order was entered on the maintenance support levels. Right. But that's in the context of what had already been done dividing the marital property. Who got what. Yes. And so then at that juncture, you're looking at the income aspects, at the new thing for maintenance and child support, correct? Yes. And then that's when there were petitions for rules to show cause. Now, as to the property disposition, it wasn't finally resolved until the post-dissolution proceedings of Judge Alt's order of last May. Because they were supposed to allocate some stocks, and they couldn't reach an agreement on the paperwork and what needed to be signed and how to value it and allocate it. That's not on appeal today, but that was attached as an exhibit to Judge Alt's order. He made a determination on the final decision as to the marital asset distributions. I mean, what I'm trying to understand is there were a lot of tangled situations in this case that sort of like a piecemeal kind of process. Is that right? Yes. And that's still going on. Yes. In fact, I think there are still some matters pending that are on hold now that are pending in the trial court in the Towson County Circuit Court that would be taken up after this case. But all the issues that could be resolved were finally resolved last May. I don't even want to ask what they might be. I'm not certain what they are. That's his time. Thank you. I don't know if anyone had any particular questions. If not, I'd like to comment about a few points from opposing counsel's presentation. He spends a bunch of time here this morning, also in his brief, trying to say that everything is just an abuse of discretion standard, that this is all just Judge Alt's days of testimony and the record is this big and the exhibits are this big. But if you look at what Judge Alt did, clearly his order says the question is whether this stock sale proceeds would be considered income. That's virtually the same language that the Lindemann court and Rogers both concluded generated a legal question on whether this type of proceeds actually is income. So this is a legal question. This is not just subject to Judge Alt's discretion whether they're included or not. Can I ask about, with regard to the factual situation, in that September Supplemental Judgment of 04. Yes, sir. That was a Supplemental Judgment that whether there was an agreement about what's marital or non-marital to a certain degree, correct? Right. And it was in that September of 04 order that parties agreed that the stock was non-marital. Isn't that right? That would be correct. It was gifted, so that's why it was. I'm not faulting people. But there wasn't a contest about that. It was determined and put in a judgment form that the stock that had been gifted earlier was non-marital property. Correct. And that's what was decided. I mean, that's what was entered as a Supplemental Judgment. And I know this, like I say, was tangled. There's a lot of entanglements in this case that have been ongoing for a number of years now. But that was established in September of 04, correct? That is correct. But I think one thing you need to keep in mind is when Judge Galley does get the case, as you said, the first part of this tangle where the parties are really litigating, they were dealing with child support and maintenance. And the record would show that you have the whole record from the beginning to the end, whether you want it or not. It's at 1,700 pages. The point is the arguments included, whether maintenance should be awarded, included that there was this property that was non-marital that Mr. Anderson had. Whenever you have any divorce case, when you're arguing about maintenance, one of the first things you look at under the statute is what the property holdings are. And there it doesn't matter whether it's marital being divided or non-marital being assigned. You still go ahead and look at the property. That's one of the main issues. You have the income from the person's employment or other income, and then you have their property. That's the first two things you look at before you look at the other 17 things that the legislature says you need to do. But this is a legal question on whether income includes this type of proceeds from a transaction. And it also, I think, is a legal question. The way Judge Ault said, I'm not going to even consider this on property. And even if you don't think it's a legal question, a judge doesn't have the discretion to just say I'm not going to follow the law. We know there's all kinds of cases on that. So even if it were a lesser standard of review, we don't think the order passes muster either because clearly these proceeds have to be considered in the overall picture of maintenance, child support also. Again, I come back to if the concern is that this looks like she's getting a second bite at the end. I can tell by the questioning that's what everybody up here, and I think that's what these other cases from the other districts are saying. But what do we do here? We have the interest that the state has said kids need to be supported in the standard of living they would have received had the parties stayed together. Well, if the parties had stayed together, Mr. Anderson would have, if he didn't have anything to do with this, this would have come up when the parties were married and his parents would have decided that these 2% people would have had to have been bought out. So you have that balance on one side. So are you saying on the child support issue that we can impute certain income to that $192,000? My first argument is the $192,000 is the income. I understand that. My second argument is that I think that is a good way of putting it. Just like on the cases where someone is underemployed, that if someone takes that kind of amount of money, and that's a good amount of money, let's face it, that if he decides he wants to put it in gold instead of investing it in something that would, if he could find something that produced 5%, 6%, if you translate this out, it's still going to be a couple hundred dollars additional amount for child support. Counselors, one minute. Let me ask, if the non-marital property was, say, another house, okay, and the house was sold, and it was found to be non-marital, and they're having a dispute with regard to maintenance and child support, and this asset, the house, was a non-marital property, and for whatever reason it's foreclosed, but there's an equity given to the, you know, it was sold at a loss, but there was equity given over the mortgage to the non, I mean, to the marital, I mean, to the spouse, okay, of this non-marital property. You'd consider all that income then? I would, and when we file our brief in seven days on this case, you're going to see why we say that. I mean, you'd say that's, even though it was non-marital property, it was owned before the marriage, found to be non-marital property, and so there's a sale that they don't make a profit on, and it's sold for, you know, under, it's not sold at a profit, and you'd consider the wholesale, whatever they got as equity. That is exactly what this case talks about. So what's the difference between selling a non-marital property interest? Because in divorce, you have property division, and you have income determinations with regard to maintenance. But if everything that's property that, if it's sold, then it just becomes income, what's the difference? Well, we basically say there is none, and the answer to that is in the deviation from guidelines. That's what these cases talk about. They talk about this other case, we're going to brief it. They seem to be saying that's where you, but I'm not sure you maybe even are the ones that answer that. Maybe the trial judge is the one that answers the balance of whether this was, maybe this all gets weighed whether it was non-marital or non-marital. Well, in the Marriage and Dissolution Act, there's a whole segment about, you know, being very careful about describing what's property, what's property that's divided, what's marital and non-marital property, and what's income for purposes of establishing maintenance and child support. But what you're suggesting is that's all washed clean, everything that's sold can be income. I would agree with the Marriage and Dissolution Act. I would agree to try to keep things separate, but then in their infinite wisdom, when you look at both child support, income, and deviation from guidelines, financial resources, meaning property, is a factor in that. On maintenance determinations, what somebody's received in marital or non-marital property is, again, a factor. So I would respectfully disagree that they've successfully separated the two out. In fact, they seem to show legislative intent that you're supposed to consider both income on property issues and property on income issues is, I guess, the best way I can put it at this point. Under your analysis, any sale of property becomes transmuted into income. That's what the cases seem to be suggesting is happening. Like I said, the remedy is what do you actually do with it once it's concluded as income, that it's not income at all. Thank you very much, Your Honors. The court will take a brief recess to allow a panel change. We will take this case under advisement, and the ruling will be issued.